ORAL ARGUMENT NOT YET SCHEDULED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 10-3074
_____

UNITED STATES OF AMERICA,
Appellee,

v.

JEROME HAMPTON,
Appellant.

_____

On Appeal from the United States District Court
for the District of Columbia, Case No. 1:07-cr-00153-14-TFH

The Honorable Thomas F. Hogan

_____

**REPLY BRIEF FOR APPELLANT JEROME HAMPTON**
_____

Christopher S. Rhee*
Isaac B. Rosenberg
Arthur Luk
Kristina M. Guidi
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004-1206
christopher.rhee@aporter.com
(202) 942-5000

*Counsel for Appellant
Jerome Hampton*

*Appointed by this Court

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

SUMMARY OF ARGUMENT ............................................................ 1

ARGUMENT ................................................................................... 4

I.   THE DISTRICT COURT ERRONEOUSLY PERMITTED AGENT
     BEVINGTON TO OFFER INADMISSIBLE SPECULATION AS LAY
     OPINION TESTIMONY ............................................................ 4
  A. Standard of Review ............................................................... 4

  B. Agent Bevington's Testimony Was Inadmissible Under Rule 701 ............... 8

  C. The District Court's Error Was Not Harmless ............................... 17

II.  THE  DISTRICT  COURT  ERRONEOUSLY  PERMITTED
     BEVINGTON TO TESTIFY BASED ON SPECIALIZED LAW
     ENFORCEMENT EXPERIENCE WITHOUT CERTIFYING HIM AS
     AN EXPERT ............................................................................ 25
  A. Standard of Review ............................................................... 25

  B. The Government Should Be Bound by the Error It Invited ................... 26

CONCLUSION ............................................................................... 29

# TABLE OF AUTHORITIES[*]

**Page(s)**

CASES

*Awkard v. United States,*
    352 F.2d 641 (D.C. Cir. 1965) ........................................................................26

*Felton v. United States,*
    170 F.2d 153 (D.C. Cir. 1948) ........................................................................19

*Keen v. Overseas Tankship Corp.,*
    194 F.2d 515 (2d Cir. 1952)..............................................................................7

*Munoz v. United States,*
    No. 07-CV-2080 (ILG), 2008 WL 2942861 (E.D.N.Y. July 28, 2008) ...........16

*United States v. Algarate-Valencia,*
    550 F.3d 1238 (10th Cir. 2008)......................................................................26

*United States v. Eiland,*
    Crim. No. 04-379(RCL), 2006 WL 2844921 (D.D.C. Oct. 2, 2006) ...............28

[*]*United States v. Grinage,*
    390 F.3d 746 (2d Cir. 2004)............................................................................15

*United States v. Hall,*
    969 F.2d 1102 (D.C. Cir. 1992) ........................................................................6

[*]*United States v. Johnson,*
    617 F.3d 286 (4th Cir. 2010)...........................................................................15

*United States v. James,*
    555 F.2d 992 (D.C. Cir. 1977) ........................................................................20

*United States v. Kaplan,*
    490 F.3d 110 (2d Cir. 2007)......................................................................15, 16

---

[*]    Authorities upon which we chiefly rely are marked with asterisks. *See* D.C. Cir. R. 28(a)(2).

*United States v. Marshall*,
   762 F.2d 419 (5th Cir. 1985)............................................................................7

*United States v. Miranda*,
   248 F.3d 434 (5th Cir. 2001)................................................................12, 13

*United States v. Moore*,
   651 F.3d 30 (D.C. Cir. 2011) .........................................................................11

*United States v. Pablo Varela-Rivera*,
   279 F.3d 1174 (9th Cir. 2002)......................................................................26

*United States v. Peoples*,
   250 F.3d 630 (8th Cir. 2001).........................................................................15

*United States v. Rollins*,
   544 F.3d 820 (7th Cir. 2008)....................................................................12, 13

*United States v. Rosado-Perez*,
   605 F.3d 48 (1st Cir. 2010) ..........................................................................12

*United States v. Santiago*,
   560 F.3d 62 (1st Cir. 2009) ..........................................................................12

*United States v. Smith*,
   640 F.3d 358 (D.C. Cir. 2011) ................................................ 3, 9, 10, 24, 27, 28

*United States v. Williams*,
   194 F.3d 100 (D.C. Cir. 1999) ......................................................................26

*United States v. Williams*,
   212 F.3d 1305 (D.C. Cir. 2000) ...............................................................19, 24

*United States v. Wilson*,
   605 F.3d 985 (D.C. Cir. 2010) ...............................................................3, 9, 11

*United States v. Young*,
   470 U.S. 1 (1985)..........................................................................................19

*Waldron v. United States*,
   219 F.2d 37 (D.C. Cir. 1955) .....................................................................6, 7

## RULES

*Fed. R. Evid. 701 .......................................................... 1, 2, 8, 9, 10, 12, 15, 16, 17

Fed. R. Evid. 702 .................................................................................................. 26

Advisory Committee's Note on Fed. R. Evid. 701(b) ............................................ 17

Advisory Committee's Note on 2000 Amendments to Fed. R. Evid. 701(c) ......... 27

## SUMMARY OF ARGUMENT

This appeal presents a matter of first impression for the Circuit: Whether an FBI administrative case agent can offer, as lay opinion testimony, his own interpretation of the meaning of common, everyday English phrases in recorded conversations introduced by the government. Under Federal Rule of Evidence 701 and case law in several other Courts of Appeals, he cannot.

At trial, Special Agent John Bevington offered his opinion of the meaning of these recorded statements (among others):

- "I pay <u>my man</u> 5,000 for every time a 10 of those [unintelligible] come in";

- "I said okay Boe <u>give me what 32</u>";

- "[H]ave you talked [to] <u>your brother</u>?"

- "[W]hen I see you <u>I'm gonna tell you everything been going on</u>."

App.000920, 000976, 000977, 000979 (emphases added).

Not surprisingly, Bevington's interpretation of each of these statements served to prove the government's case, that Appellant Jerome Hampton was complicit in Lonnell Glover's PCP operation. According to Bevington, "my man" and "your brother" were both references to Hampton, App.000297, 000332–33, even though Glover — who uttered the first phrase and received the second — used the term "my man" on other recordings to refer to other people and actually

- 1 -

had a brother who was charged as part of this conspiracy, App.000040, 000172. "[G]ive me what 32" was supposedly a request by Hampton for 32 ounces of PCP, App.000629–30, but the government introduced no evidence whatsoever that Hampton ever distributed or used PCP. And "I'm gonna tell you everything been going on" allegedly meant that Glover was going to confide in Hampton about the government's recent seizure of PCP, App.000331, even though Glover had referenced several different events (most of them unrelated to drugs) during that conversation.

Bevington had no firsthand knowledge of the meaning of any of these statements. With the possible exception of the number "32," *see infra* note 3, none of the phrases included slang or coded terms common either in the PCP trade or the Glover conspiracy. Bevington's opinion about the meaning of the recordings was speculation, based entirely on deductions he and the government drew from other evidence. *See, e.g.*, App.000331 (explaining his interpretation of Activation 5982 with the phrase, "logically in the context"). This testimony should have been excluded from the factual record under Federal Rule of Evidence 701.

The government has done its best to muddle this issue. First, it argues (incorrectly) that the defense failed for the most part to lodge an objection to this testimony. In fact, Hampton's objections to Bevington's speculative testimony were noted on four separate occasions — including a "standing objection" the

defense made after the first day of testimony that covered almost all of the questionable opinions, and which the District Court accepted.

Second, the government argues (incorrectly) that two decisions by this Court — *United States v. Smith*, 640 F.3d 358 (D.C. Cir. 2011) and *United States v. Wilson*, 605 F.3d 985 (D.C. Cir. 2010) — already settled this very question in its favor.   Both of those decisions, as well as several others upon which the government relies, concern a different type of opinion testimony:  testimony about the meaning of drug lingo like "dope" or code words like "big shoes."  These cases do not apply when, as here, a government agent seeks to offer lay opinion testimony to interpret everyday phrases like "my brother" or "everything [that's] been going on," based on his knowledge (or lack thereof) of the speaker's intent. The Courts of Appeals that have considered this type of lay opinion testimony have ruled consistently for the defense.

The District Court's error in admitting this testimony over defense objection prejudiced Hampton and necessarily contaminated the jury's verdict.  Bevington's interpretations were integral to the government's case, which otherwise relied on disparate circumstantial evidence and a cooperating witness with significant credibility issues.   The government compounded this error when Bevington bolstered his own testimony by telling the jury that "anybody who has listened to all of the calls and is aware of all of the conversations would agree" with his

interpretations.  App.000370.  Accordingly, the Court can have no confidence in the outcome of the trial below.

## ARGUMENT

**I.    THE DISTRICT COURT ERRONEOUSLY PERMITTED AGENT BEVINGTON TO OFFER INADMISSIBLE SPECULATION AS LAY OPINION TESTIMONY**

### A.    Standard of Review

The government contends that Hampton preserved an objection to Bevington's speculative testimony only as to one recording, Activation 5982, and therefore asks the Court to apply the plain error standard of review to Hampton's challenge to Bevington's testimony about Activations 100 and 830.  Gov't Br. 34, 43–44.  This argument is baseless.

As an initial matter, as discussed below, *see infra* note 1, Hampton's argument in his opening brief challenged all of Bevington's speculative lay opinion testimony, not just the three examples that are cited by the government. Accordingly, the harmless error standard should apply to this entire argument.

In any event, *before* the government introduced Activations 100 and 830 (along with other recordings that Bevington interpreted), Hampton's objections to Bevington's speculative testimony were noted on four separate occasions — including a "standing objection" that was accepted by the court.  App.000324; *see also id.* at 000133, 000297, 000328.  Hampton did not waive the same objection merely because he did not continue to repeat it *ad nauseum* throughout the trial.

- 4 -

*First*, immediately after the government filed (on the eve of trial) a pretrial motion in limine  to call "a law enforcement agent to provide interpretations" of recorded conversations, Hampton filed a short statement of opposition.  This was intended to preserve his objection (while he was replacing his original lawyer) regarding an issue that arose repeatedly during Hampton's first trial.

*Second*, during the first day of testimony, Hampton objected when the government asked Bevington to whom Velma Williams was referring in Activation 6189, when she asked Lonnell Glover about his brother.  App.000297.  Hampton explained that "this is pure speculation on [Bevington's] part" and that the term brother "could refer to numerous people."  App.000298.  (In fact, Glover's brother Cornell was an indicted co-conspirator in this case.  App.000040.)  The District Court overruled the objection and permitted Bevington to testify that Williams was referring to Hampton.  App.000299.

*Third*, before the next day of testimony, after the government had announced its intention to introduce a series of recorded conversations between Lonnell Glover and Jerome Hampton, App.000310, the District Court held a bench conference to discuss Hampton's concern with both "Bevington testifying without being called as an expert and his lay opinions about the coded conversations," App.000322–23.  The District Court ruled that it would allow such testimony "over

objection" by the defense. App.000324. Hampton asked for "a standing objection here . . . for the record," which the District Court granted. *Id.*

*Fourth*, as discussed in Hampton's opening brief, Hampton objected to the "complete and utter speculation" of Bevington's testimony about the meaning of Glover's final statement to Hampton on Activation 5982 ("I'm gonna tell you everything been going on."). App.000328. Again, the Court overruled the objection, stating:

> I think that there is a sufficient basis on the record with the sequence and the contents of each of these phone calls, and Agent Bevington has experience in this case from reviewing all of the thousands of phone calls . . . , so he can talk about his opinion as to what he believed they were discussing when he says that.

App.000329.

Armed with a "standing objection" to Bevington's speculative testimony about the meaning of the recorded conversations, Hampton certainly did not waive this objection when, beginning only a few moments later, the government asked Bevington to interpret additional recordings. *See United States v. Hall*, 969 F.2d 1102, 1109 n.8 (D.C. Cir. 1992) (defendant did not waive challenge to testimony by failing to object a second time when the first objection "was flatly rejected by the district court *only moments earlier*" (emphasis in original)); *Waldron v. United States*, 219 F.2d 37, 41 (D.C. Cir. 1955) ("[A] trial court may reverse itself on a point during trial, but that possibility does not create an obligation on the part of

counsel constantly to renew their contentions."); *see also United States v. Marshall*, 762 F.2d 419, 425 (5th Cir. 1985) ("[A] continuing objection . . . need not be repeated to preserve the objection to subsequent evidence admitted within the scope of the ruling."); *Keen v. Overseas Tankship Corp.*, 194 F.2d 515, 519 (2d Cir. 1952) (Hand, J.) ("The notion is wholly untenable that in order to protect himself against an imputed surrender, a party must reassert what has been overruled every time the occasion comes up again.").

The government claims in a footnote that an objection based on "speculation" is fact-specific and therefore "Appellant's earlier objection, directed at different testimony, would not have alerted Judge Hogan that counsel believed this testimony was speculative as well." Gov't Br. 47 n.28. But there was virtually nothing fact-specific about the nature of these objections, the discussions that ensued, or the outcome, *see, e.g.*, App.000328–29 — as evidenced by at least eight instances during Hampton's first trial when the District Court overruled identical defense objections. *See, e.g.*, 10/22/08:104–05, 109–110; 10/23/08(am):82; 10/23/08(pm):5–6, 68; 10/27/08(am):10; 10/27/08(pm):9; 10/28/08(pm):56.

Notably, the government consistently offered the same justification for Bevington's testimony whenever the issue arose: Bevington had personal knowledge based on his role in the government's investigation. *See, e.g.*, App.000057 ("The interpretations will be based on the agent's personal knowledge

of the investigation, and personal knowledge from listening to all the wiretap calls being used at trial."); App.000297 ("I think he has listened to all calls, and he's done the surveillance, and he has seen all the evidence in this case, and he has based his opinion based on this investigation."); App.000323 (District Court noting that the "government has argued" in defense of lay testimony "where it was the personal knowledge of his or her participation in the investigation").

Indeed, this Court need not even hypothesize what would have happened if Hampton had objected separately to testimony about Activation 100, just moments after the District Court had overruled his objection involving Activation 5982. During his first trial, before the same judge, Hampton did object to Bevington's testimony about Activation 100, and the outcome was predictable:

> Q.  At the very top of that conversation when Mr. Glover says, "Now I pay my man $5,000 for every time a ten of those come in," what do you think Mr. Glover is talking about there?
>
> MR. SILVER:  Objection, speculation.
>
> THE COURT: I'll allow him to talk about what he understands from the conversation.  He's the expert.

10/28/08(pm):56.

## B.   Agent Bevington's Testimony Was Inadmissible Under Rule 701

Rule 701 requires that lay opinion testimony be both rationally based on the witness's perception — *i.e.*, the witness's firsthand experience — and helpful to clearly understanding the witness's testimony or determining a fact in issue.  As

- 8 -

discussed in Hampton's opening brief, Bevington's testimony met neither of these requirements, let alone both.[1]

The government contends that this matter is nevertheless settled in its favor because this Court has found "the very type of opinion testimony at issue here to be admissible under Rule 701" in both *United States v. Smith* and *United States v. Wilson*. Gov't Br. 43. That characterization is simply wrong. Both of those cases addressed the admissibility of lay opinion testimony interpreting common drug slang terminology or lingo. But as the government itself acknowledges, Gov't Br. 48 n.29, Hampton is not questioning that type of testimony with this argument. The underlying statements at issue here — *e.g.*, "I'm gonna tell you everything [that's] been going on" — involve common everyday English, not slang or code words.

---

[1]    The government incorrectly characterizes Hampton's argument — which challenges the entire premise of Bevington's lay opinion testimony — as limited to the interpretation of just three recordings. Hampton's opening brief highlighted these three recordings as exemplars of the error committed by the District Court. But the brief cited other instances, *see, e.g.*, Appellant's Br. 11, 29, and never restricted the discussion of Hampton's argument to just these three examples. *Compare* Appellant's Br. 27 ("On Numerous Occasions, Agent Bevington Offered Speculative Testimony About Recorded Conversations."), *and id.* at 41 ("Bevington's speculative testimony about the meaning of recorded conversations . . . failed to comply with either the first or second requirement of Rule 701."), *with* Gov't Br. 33 ("The three instances . . . about which appellant complains were properly admitted under Fed. R. Evid. 701.").

In total, Bevington offered speculative testimony in violation of Rule 701 on at least eight occasions. *See* App.000297, 000328, 000333, 000335, 000338–39, 000354, 000355, 000629–33.

In *Smith*, the Court addressed the question whether "Agent Bevington's interpretation of drug dealers' slang was not admissible under Rule 701 as lay testimony because it was based on 'specialized knowledge' Bevington gained from working on other drug investigations." 640 F.3d at 365. Both the defendant's argument and the Court's ruling related only to the meaning of slang terminology that Bevington had encountered in other drug investigations — "words such as dope, key, and hardball." *Id.* The Court ruled that such testimony was inadmissible under Rule 701 (but admissible under Rule 702 as expert testimony). *Id.*

The Court also considered (and rejected) the claim that one statement at the outset of Bevington's testimony — "Mr. Smith and Mr. Glover were working together putting their money together and going to New York to buy heroin," *id.* at 366 — constituted improper "overview testimony" because it was based on inadmissible hearsay. *Id.* at 366–67. Somehow, the government believes that this one sentence of overview testimony is "substantially similar to that at issue in this case," Gov't Br. 37, and that the defendant in *Smith* "made the same Rule 701-based compliant about SA Bevington's testimony that appellant . . . makes here," *id.* at 37 n.24. The government is mistaken.

The defendant in *Smith* argued that Bevington's overview testimony at the outset of the case "improperly paint[ed] a picture of guilt *before the evidence [was]*

*introduced*, and affected the jury's fair consideration of that evidence."  Brief of Appellant John Smith, *United States v. Smith*, No. 09-3119, 2010 WL 4973505, at *21 (D.C. Cir. May 3, 2010) (emphasis added) (quotation omitted).   Here, Hampton is not challenging his conviction on the basis of conclusory testimony that Bevington offered *before* he introduced any recordings.   Rather, he is challenging Bevington's testimony about the meaning of the recordings themselves after he played them.[2]

The government's reliance on *Wilson* is similarly misplaced.  In *Wilson*, the Court considered whether the defendant should have been allowed to call a former drug dealer to offer lay opinion testimony about "terminology used in drug operations," 605 F.3d at 1026, based on his "past personal experience with other, similar drug operations," *id.*  Noting that "[a] witness with firsthand experience of

---

[2]    Hampton did point out in a short footnote in his opening brief, Appellant's Br. 46 n.13, that Bevington offered improper overview testimony at the outset of the case in violation of *United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011) — which expressly "condemn[ed] the practice" of "a witness presenting an overview of the government's case-in-chief."   *Id.* at 61.  This passing observation of yet another error by the government is hardly the focal point of Hampton's appeal.  Indeed, Hampton's brief expressly noted that the *Moore* case was not "directly on point" regarding his main argument.  Appellant's Br. 45.

*Moore* is the controlling law in this Circuit regarding overview testimony.  *Moore* was decided after *Smith* and includes a far more extensive and definitive analysis of the problems with overview testimony.  The ruling in *Smith* addressed only whether Bevington offered improper overview testimony *because it was based on inadmissible hearsay*, *see* 640 F.3d at 367–68 — an argument Hampton is not making here.

a particular drug operation may testify under Rule 701," *id.* at 1025 (citation omitted), the Court affirmed the decision to exclude the proffered defense witness because "Robinson had no firsthand experience with the M Street Crew [whose coded language was at issue]," *id.* at 1026.

These cases, and *all* the others featured in the government's brief, *see* Gov't Br. 40 n.26 (listing cases), hold that a government agent who has acquired extensive knowledge about a drug conspiracy through listening to recordings and conducting surveillance can be qualified to decipher coded conversations for the jury. For example, in *United States v. Rollins*, 544 F.3d 820 (7th Cir. 2008), "one of the speakers would start talking out of the blue about 'having drinks,' the height of a 'singer' in a 'band,' 'work,' 'big shoes and little shoes' and a variety of other things that would appear at first to be virtually nonsensical." *Id.* at 831. Over time, the court reasoned, a government agent can become "intimately familiar with the unusual manner of communicating used by these conspirators." *Id.*; *see also United States v. Rosado-Perez*, 605 F.3d 48, 55 (1st Cir. 2010) ("[Agent] Chavez . . . interpreted coded language."); *United States v. Santiago*, 560 F.3d 62, 66 (1st Cir. 2009) ("[Undercover agent] Marcos Chavez . . . testified at trial as to the meaning of code words or phrases used by the defendants, primarily to designate drug quantities."); *United States v. Miranda*, 248 F.3d 434, 441 (5th Cir.

2001) ("[Special Agent] Vega identified various code words that callers had used and the English drug terms to which the words referred.").

This appeal presents a different question: Whether a government agent can opine about the meaning of routine English phrases that are not being used as code. The government does not dispute that the recordings actually at issue here feature common, everyday phrases that Bevington attempted to explain for the jury: "everything [that's] been going on," "my man," "your brother," "you gotta be on point," "the coffee place" — even the number "32." Moreover, the government does not contend that any of these phrases (save perhaps one) are code words that have some secret meaning to the members of Glover's PCP conspiracy.[3]

To be sure, there was general testimony that some of the alleged conspirators "spoke in code or guarded terms." Gov't Br. 50; *see, e.g.*, App.000519, 000541. The government's cooperating witness, Velma Williams, resorted to using unmistakable code words during her conversations with Lonnell Glover. *See, e.g.*,

---

[3]    The government argues that "32" is a common reference in the conspiracy to a 32-ounce container of PCP. Even if it was intended to refer to PCP, the term "32" is merely a form of shorthand — much like "six pack" might be shorthand for "a six pack of Budweiser." It is not a code word with some hidden meaning like the terms used in *Rollins*. *See* 544 F.3d at 828 ("Agent McGarry . . . testified that his impression was that when Rollins Sr. and Pittman talked about 'big shoes and little shoes' . . . , they were talking about 18 ounces and 9 ounces of cocaine."). Besides, the only instance in which Hampton used the term "32" was inside Glover's truck — where code was not needed because, in the government's words, they "would never ever have thought they were being recorded" there. App.000100.

App.000928 ("[I]nstead of them having the Easter egg hunt where they was going to have it . . . . [t]hey gonna have it 2 doors down . . . ."); App.000945 ("[H]ow many boxes of [T]ide did [the maid] leave to wash all the clothes?").   But Bevington did not bother to interpret those recordings — which used a pretty transparent code.  *See* App.000338, 000357.  He interpreted recordings that were much more innocuous, probably because (without his interpretation) they *were* much more innocuous.

Indeed, several of the interpretations at issue here involved conversations captured by a microphone inside Glover's truck. *See, e.g.*, App.000332–34, 000334–37, 000629–33.  The government made a point of telling the jury that the co-conspirators would "never ever have thought that they were being recorded . . . inside the truck," and thus spoke "openly and freely as if you were a fly in the window there."  App.000100, 000813; *see also* App.000100 ("And when you hear the conversations inside the pickup truck, you are going to see the co-conspirators with their guard down . . . .  [which] is going to give you all a front seat window into how this PCP conspiracy operated.").  The government has failed to show why words spoken so "openly and freely" — *i.e.*, not in code — warrant any interpretation by a fact witness.

Hampton noted in his opening brief that several Courts of Appeals have found inadmissible the same kind of speculative testimony about common

everyday phrases in recorded conversations.  Appellant's Br. 43, 50; *see, e.g.*, *United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001) (lower court erroneously permitted FBI case agent to interpret "plain English words and phrases," including "her opinions about what the defendants were thinking during the conversations"); *see also United States v. Johnson*, 617 F.3d 286, 295 (4th Cir. 2010) (lower court erroneously permitted DEA agent to interpret a phrase that government acknowledged was "not typical drug code"); *United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004) (lower court erroneously permitted DEA agent, whom government acknowledged "did not testify to coded language," to speculate that recorded dispute over money related to "drug debt").  The government has not cited a single decision going the other way.  Instead, the government essentially tries to sweep the problem under the rug by relegating its entire discussion of this line of authority to a single footnote.  *See* Gov't Br. 50 n.30.

There was no legitimate justification for allowing Bevington to interpret recorded conversations in plain English.  The government posits that it was enough that Bevington simply explained the basis for his interpretation.  *See* Gov't Br. 33–34, 50.  Rule 701 demands more than this.  In this context, it requires a foundation of firsthand knowledge about what the speaker actually intended.  *See United States v. Kaplan*, 490 F.3d 110, 119 (2d Cir. 2007) (Rule 701(a) requires that "the witness has personal knowledge of one or more 'objective factual bases from

which it is possible to infer with some confidence that a person knows a given fact'" (quoting *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992))).

Bevington had no such foundation for his opinions. For example, his opinion regarding Activation 5982 — that "I'm gonna tell you everything [that's] been going on" meant Glover "is going to tell Mr. Hampton what happened with the search warrant and everything related to that," App.000328 — was nothing more than conjecture. He identified or relied upon no other recordings wherein Glover revealed or even hinted at his intentions. *See* App.000327–28, 330–31. Rather, Bevington simply reasoned deductively from the surrounding events — reasoning the jurors were perfectly capable of performing on their own, without his assistance. *See, e.g.*, App.000331 (explaining his opinion testimony: "so logically in the context").[4]

Rule 701 requires more than educated guesswork. If Bevington's testimony was properly admitted — that is, if a lay witness is qualified to opine about the meaning of the evidence simply by virtue of reviewing the record and offering a

---

[4] The quality of Bevington's deductive reasoning is irrelevant. What matters is that he had no firsthand knowledge about Glover's intentions from which he could form his opinion. Bevington's testimony "sought to usurp the role for the jury by dictating to it what inferences to draw from the ambiguous and facially innocent statements made." *Munoz v. United States*, No. 07-CV-2080 (ILG), 2008 WL 2942861, at *21 (E.D.N.Y. July 28, 2008); *see also id.* ("[T]he recorded calls contain no reference to drugs or money; the inculpatory nature of those recordings is derived entirely from the agents' interpretations of them and from the objectively suspicious circumstances in which the conversations took place.").

logical explanation for his or her reasoning — then Rule 701 would cease to protect the jury from "meaningless assertions which amount to little more than choosing up sides." Advisory Committee's Note on Fed. R. Evid. 701(b). The government's reading of the Rule is an open invitation for litigants to offer dueling interpretations of the evidence through lay witnesses.[5]

### C.    The District Court's Error Was Not Harmless

As Hampton argued in his opening brief, Bevington's testimony interpreting the meaning of the recorded conversations was highly prejudicial to Hampton's defense. Bevington was a government agent with credibility before the jury. His testimony was central to the government's case; without it, the government acknowledged that many of the recordings (particularly those featuring Hampton) were "very, very cryptic." App.000099. The other evidence, as discussed below, was far from strong. Much of the government's case was devoted to proving that Lonnell Glover and Velma Williams, the government's own cooperating witness, were engaged in an extensive conspiracy; this point that was never contested.

---

[5]    The alternative, that only government agents can qualify to offer their interpretations of recorded conversations, seems patently unfair. Yet the District Court here was so inclined. When confronted with a request by one of Glover's other alleged co-conspirators to call a defense witness to counter Bevington, the District Court stated: "I'm very leery of having people come in and interpret these calls as to what they think he said. The agent was allowed to do that because of his experience in this case. . . . I don't know if other lay person[s] can qualify to that or not." 1/30/09:28–29, *United States v. Smith et al.*, Crim. No. 07-153 (D.D.C.).

Most importantly, the government undermined any confidence in the verdict when both it and Bevington himself improperly bolstered his testimony. Bevington told the jury that "anybody who has listened to *all of the calls* and is aware of *all of the conversations* would agree" with his interpretations of the recordings.  App.000370 (emphases added).  In contrast, someone who "*didn't know other things* about the investigation" might interpret the recordings more innocuously.  *Id.* (emphasis added).  The government echoed these points in open court.  *See, e.g.*, App.000297.

Remarkably, the government argues that the jury would not have necessarily "understood SA Bevington to have been referring to evidence not already before the court."  Gov't Br. 46 ("[I]t is certainly not obvious . . . .").  But it is impossible to fathom how "all the calls" and "all the conversations" — a universe of roughly 20,000 activations that Bevington told the jury he personally reviewed, App.000139, 000147–48, 000191–92 — is not a reference "to evidence not already before the court."  The jurors, after all, were privy to only 61 recordings on two CDs.  Bevington told them that anyone in their position simply "didn't know other things about the investigation" that would permit them to interpret the recordings

the correct way (meaning his way). App.000370. There is nothing "arguably unclear" about that testimony. Gov't Br. 46.[7]

Aside from disavowing the "obvious," the government's other response to this highly prejudicial bolstering of the government's case is to point the finger at Hampton for cross-examining Bevington. *See, e.g.,* Gov't Br. 46 ("Appellant is in no position now to claim prejudice based on . . . testimony which he elicited . . . ."). The government manages to make this argument in its brief right before noting that the antidote for lay opinion testimony is "'the opportunity'" for "'opposing counsel to expose a weak foundation through cross-examination of the witness.'" *Id.* at 35 (quoting *Williams*, 212 F.3d at 1309). Of course, this is exactly what Hampton was trying to do on cross-examination, with an extremely uncooperative government witness. *See, e.g.*, App.000369 ("Q . . . . So you would agree with me that you don't have direct evidence . . . .? A. . . . I think it is relatively clear what he is saying.").

In short, Hampton did not "elicit" Bevington's testimony about evidence that was not in the record. Bevington volunteered it, one day after the government

---

[7]    The fact that Bevington did not describe for the jury the "other things about the investigation" that he knew is irrelevant. It was enough that Bevington "convey[ed] the impression that evidence not presented to the jury, but known to the [government], supports the charges against the defendant . . . ." *United States v. Young*, 470 U.S. 1, 18 (1985) (discussing improper prosecutorial arguments). Indeed, the impression left by Bevington was far more damaging to Hampton than the non-record evidence would have been.

made a similar statement in open court, *see* App.000297. Nowhere in *Felton v. United States* — the 60-year-old case quoted twice by the government in its brief— does the Court hold that a defendant is estopped from challenging nonresponsive testimony that a government witness volunteers during cross-examination. *See* 170 F.2d 153 (D.C. Cir. 1948); *see also United States v. James*, 555 F.2d 992, 998 (D.C. Cir. 1977) (reversible error committed when government witness gave nonresponsive answer with damaging testimony in response to question whether defendant's note "could mean anything else").[8]

Without Bevington's speculative interpretations of the recordings, the government's case against Hampton was tenuous. The government claims that some of Bevington's testimony was cumulative of other evidence — namely, the testimony of government cooperator Velma Williams. *See* Gov't Br. 47, 53. But the government did not "present[] strong and direct evidence of appellant's guilt"

---

[8]    The government notes that Hampton did not move to strike "the previously-admitted opinion testimony" after Bevington's statements on cross-examination. Gov't Br. 46. This would have been a futile gesture, as Hampton had objected multiple times without any success, and the District Court had accepted the underlying reasoning of his statements. *See* App.000329 ("Agent Bevington has experience in this case from reviewing all the thousands of phone calls and understanding, so he can talk about his opinion as to what he believes they were discussing."). Besides, the bell had already been rung. The jury was not suddenly going to forget what Bevington told them — especially that he had "listened to all the calls" and had acquired knowledge of "other things about the investigation" that he, the government, and the court all believed rendered him highly qualified to opine about the recordings. In fact, to move to strike or seek a cautionary instruction would only have called more attention to Bevington's improper testimony.

- 20 -

through Williams, *id.* at 53, a witness who broke down on the stand crying and sobbing when confronted with obvious inconsistencies with her testimony, App.000539, 000555, 000833–34.  There can be no doubt whose testimony was more credible:  that of the FBI agent who spent years working on the Glover drug investigation, not the confessed and convicted trafficker of PCP and cocaine with serious credibility issues.

The government's other attempts to dress up the trial evidence fare no better. The government argues that "appellant's defense was especially weak and lacking in credibility" because Hampton "went to some length to paint himself as an established businessman" and "attempted to depict his relationship with Glover, a prolific drug dealer, as a legitimate business relationship."   Gov't Br. 55. Respectfully, it is this argument by the government that is "especially weak and lacking in credibility."   The evidence that Hampton was an established businessman with legitimate business dealings with Glover and Williams was extensive and completely undisputed.   *See, e.g.*, App.000296 (Bevington's testimony); App.000590–94 (Williams's testimony); App.000862–63 (statements of Judge Hogan at sentencing); *see also* App.000671–72, 000679–80, 000681, 000687–90; App.000860–63; Doc. No. 672-1.

Indeed, in the District Court, the government accepted this undisputed evidence and stated that Hampton "is a successful businessman *by all accounts*."

App.000870 (emphasis added). Judge Hogan described Hampton as "a gentleman who has succeeded, who runs *from all the materials provided to me prior to and now and [at] the trial as well as sentencing* a successful family business, a respected businessman and leader in the community." App.000862 (emphasis added).[9]

Remaining bits of evidence cited by the government are also unconvincing:

- The government contends that "[t]he very fact that Glover and Williams asked appellant to perform such a critical task" — receiving shipments of what the government alleges was PCP — "is a strong indication of guilty knowledge." Gov't Br. 52 (citing cases). However, this claim is undercut by the actual evidence at trial, namely the testimony of the government's expert witness on the PCP trade (Anthony Washington), who confirmed that drug dealers do ship drugs to unknowing and unwitting participants. App.000248–49.

---

[9]    Unable to counter this evidence, which flies in the face of the government's argument, the government resorts to gratuitous quotations of Hampton's use of profanity. *See, e.g.*, Gov't Br. 12 n.15. But the fact that Hampton had a friendly relationship with Glover and spoke with him in colorful language is hardly evidence of guilt. Indeed, the government is off base in suggesting that Hampton's use of profanity during one call — "Was the computers and shit alright?" App.001001 — is proof that Hampton was aware Glover was shipping PCP rather than computers to Hampton's office. *See* Gov't Br. 56. The government offered no opinion testimony that "shit" is code for PCP. It is far more likely that Hampton was asking colloquially about the computers "and computer parts" that Glover had mentioned. App.000694–95.

- Contrary to the government's view, Gov't Br. 53, the recording of Glover telling Henry Brown, "everybody ain't gonna let you do this shit, send that shit to your place," App.000941, does not prove Hampton knowingly accepted shipments of PCP.  If anything, it offers a reason why Glover resorted to using Hampton *without* telling him the contents of the shipments.

- The government wrongly asserts that the FedEx and UPS records prove "Appellant's guilty knowledge."  Gov't Br. 53.  There was no evidence that Hampton knew the packages sent to his office had "phony [return] addresses and came from non-existent businesses."  *Id.* at 53–54.

- There is nothing "especially devastating," Gov't Br. 55, about Activation 830 ("okay Boe give me what 32").  As reflected in the government's own transcript of the conversation, App. 000977–78, it is a confusing and largely unintelligible discussion that occurred more than two months after the last set of shipments were sent to Hampton's office park.  Moreover, it followed closely on the heels of two other discussions with Glover about prescription drugs, not PCP.  App.001008–09, 001010–12.[10]

---

[10]    Perhaps this is why the government continues to mischaracterize this recording to suggest that Hampton asked for "*a* 32" rather than simply "32."  The

Footnote continued on next page

The evidence of Hampton's guilt simply does not compare to what the government introduced as to Glover, Williams, and alleged co-conspirator John Smith. *See, e.g.*, *Smith*, 640 F.3d at 364 (evidence included "many recordings of phone calls between Smith and Glover in which they discussed their drug distribution ring; Smith's recorded description of his guest flushing his drugs down the toilet; and the 316 grams of heroin, two loaded firearms, and $27,730 in cash seized from Smith's bedroom"). By far the most "devastating" evidence that the jury heard was Bevington's own theories of what the recordings meant — theories that he insisted were not subject to debate once "all the recordings" and "all the calls" were considered. With the erroneous admission of this testimony, the Court cannot say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Williams*, 212 F.3d at 1310 (quotation omitted).

---

Footnote continued from previous page

government's brief misquotes from the government's own recording transcript. *Compare* Gov't Br. 23 ("Appellant asks Glover for *a* '32' of PCP on June 15, 2007." (emphasis added)), *with* App.000977 ("I said okay Boe give me what 32."). As Hampton noted in his opening brief, the government made the same error at least four different times at trial. Appellant's Br. 37 n.11. It is hard to believe these misstatements are entirely accidental, insofar as the government's theory was (and remains) that Hampton was asking for *a* 32-ounce bottle of PCP and not 32 prescription pills.

## II.    THE DISTRICT COURT ERRONEOUSLY PERMITTED BEVINGTON TO TESTIFY BASED ON SPECIALIZED LAW ENFORCEMENT EXPERIENCE WITHOUT CERTIFYING HIM AS AN EXPERT

### A.    Standard of Review

The government contends that the District Court did not commit reversible error by failing to certify Bevington as an expert before allowing him to offer certain testimony based upon his specialized law enforcement experience.  Gov't Br. 57.  The government invites the Court to review the issue only for plain error because it claims that Hampton did not properly preserve his objections to such testimony.  *Id.* at 58.  That is wrong.

For nearly two years before Hampton's conviction — when the government first disclosed Bevington's anticipated "lay opinion" testimony in a discovery letter, App.000051 — the government and the defense wrangled over the capacity in which Bevington would testify.  The District Court repeatedly overruled defense objections to the government's failure to qualify Bevington as an expert, including in Hampton's first trial with co-defendant Glover, as well in the trials of both Anthony Suggs and John Smith.  App.000057, 000310–11; 10/22/08:67–68; *Smith*, 640 F.3d at 365.[6]  Hampton subsequently lodged, prior to his second trial, his

---

[6]     *See also* 1/30/09:34, *United States v. Smith et al.*, Crim. No. 07-153 ("I'll look at that as to whether or not the agent is truly testifying as an expert or a lay witness giving his opinions about the meaning of the tapes that he's listening to. Last time I felt that he was a lay witness . . . .").

objection to the government's December 4, 2008 motion in limine renewing its intent to call Bevington to offer "lay opinion" about the meaning of recorded conversations.  App.000060.

In light of the District Court's several prior adverse rulings on specific objections raising this exact issue, Hampton's "one-page pro-forma objection," Gov't Br. 58, was more than sufficient to preserve the matter for appellate review. Additional objections would have been futile.  *See United States v. Pablo Varela-Rivera*, 279 F.3d 1174, 1177–78 (9th Cir. 2002) ("Where the trial court has left no possibility of a different ruling on a renewed objection, there is no requirement that a party engage in a futile and formalistic ritual to preserve the issue for appeal."); *accord United States v. Algarate-Valencia*, 550 F.3d 1238, 1243 (10th Cir. 2008); *United States v. Williams*, 194 F.3d 100, 102 (D.C. Cir. 1999), *abrogated on other grounds by United States v. Webb*, 255 F.3d 890 (D.C. Cir. 2001); *Awkard v. United States*, 352 F.2d 641, 645 n.9 (D.C. Cir. 1965).

### B.     The Government Should Be Bound by the Error It Invited

The government had the option of certifying Bevington to offer expert opinions, but repeatedly throughout the proceedings below disavowed that option. App.000051, 000057, 000310–11.  Having clearly made its choice to elicit only "lay opinion" testimony from Bevington — and thereby evade the gatekeeping requirements for expert testimony under Federal Rule of Evidence 702 — the

government could not properly have suborned expert opinions through its lay witness.  *See generally* Advisory Committee's Note on 2000 Amendments to Fed. R. Evid. 701(c) ("By channeling testimony that is actually expert testimony to Rule 702, the amendment also ensures that a party will not evade the expert witness disclosure requirements set forth in . . . Fed. R. Crim. P. 16 by simply calling an expert witness in the guise of a layperson." (citations omitted)).

That is precisely what the government did here.  Not only did it elicit multiple expert opinions from Bevington, App.000132, 000133, the government admitted that it had "instructed him to testify" on the basis of "his . . . knowledge from law enforcement . . . ."  App.000215.  The government made this confession even though it had represented, prior to trial, that Bevington "will not rely on information learned from other investigations."  App.000057.

It would distort all notions of fairness to relieve the government, on appeal, of the consequences of its stated choice to elicit only lay opinion testimony simply because the government potentially could have qualified Bevington as an expert anyway.  The government invited this error, and it should be bound by it.

Under this Court's decision in *Smith*, the District Court clearly erred in permitting Bevington to offer expert opinions about the meaning of certain coded language without being qualified as an expert.  *See Smith*, 640 F.3d at 365 ("Agent Bevington's interpretation of drug dealers' slang was not admissible under Rule

701 as lay testimony because it was based on 'specialized knowledge' Bevington gained from working on other drug investigations."). The District Court's error was obvious at the time of Hampton's trial if for no other reason than the government's conduct was contrary to Judge Lamberth's ruling in *United States v. Eiland*, the very authority on which the government relied to call Bevington as a lay witness. *See* Crim. No. 04-379(RCL), 2006 WL 2844921, at *5 & n.9 (D.D.C. Oct. 2, 2006) ("[T]he government should be mindful on direct examination of these lay witnesses to avoid questions that would indicate to the jury that the witness' understanding of the conversations were based on their extensive experience as law enforcement officers . . . ."); *see also* App.000051, 000057, 000299, 000310, 000323, 000328 (citing *Eiland* as authority).[7]

Ultimately, for the reasons discussed in Hampton's opening brief, the District Court's error was not harmless. Appellant's Br. 56–59.

---

[7] In fact, one of the two prosecutors who tried the case below should have been acutely aware of the limitations set forth in *Eiland*: He was "actually one of the trial attorneys with Judge Lamberth" in that case. App.000328.

## CONCLUSION

For the reasons set forth above, Appellant Jerome Hampton respectfully requests that this Court vacate his judgment of conviction and remand for further proceedings.

Respectfully submitted,

/s/  *Christopher S. Rhee*

Christopher S. Rhee*
Isaac B. Rosenberg
Arthur Luk
Kristina M. Guidi
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004-1206
christopher.rhee@aporter.com
(202) 942-5000

February 29, 2012                    *Counsel for Appellant Jerome Hampton*

*Appointed by this Court

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B).  This brief contains 6,912 words as counted by Microsoft Word 2007, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Cir. R. 32.  This brief has been prepared in proportionally spaced typeface using Microsoft Word 2007 14-point Times New Roman font.

/s/  *Christopher S. Rhee*
Christopher S. Rhee

## CERTIFICATE OF SERVICE

I certify that on February 29, 2012, the Reply Brief for Appellant Jerome

Hampton was served upon the following through the Court's ECF electronic filing

system:

> Suzanne Grealy Curt, Esq.
> Roy W. McLeese, III, Esq.
> U.S. Attorney's Office
> Criminal Appellate Division
> 555 4th Street, NW
> Washington, D.C. 20530

> /s/  *Christopher S. Rhee*
> Christopher S. Rhee